IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| ALAN DOSKY<br><br>    *Plaintiffs*,<br><br>v.<br><br>JASON PICANZO,<br>in his individual capacity;<br><br>KELBY GARDNER,<br>in her official capacity<br>and<br><br>METROPOLITAN GOVERNMENT OF<br>NASHVILLE AND DAVIDSON<br>COUNTY, TENNESSEE<br>    *Defendants*. | Civil Action No:<br><br>Judge:<br><br>Magistrate Judge<br><br>JURY DEMAND |

# COMPLAINT

1. Plaintiff brings this 42 U.S.C. § 1983 action alleging that Defendant, Metro Nashville Police Department ("MNPD") Lieutenant Jason Picanzo ("Lieutenant Picanzo") violated Plaintiff's constitutional rights on September 25, 2023[1] by ordering Plaintiff's false arrest in violation of the Fourth Amendment to the U.S. Constitution. Plaintiff further alleges that John Overton High School, Metro Nashville Public Schools ("MNPS") and the Metropolitan Government of Nashville and Davidson County, violated his Fourteenth Amendment due process rights by temporarily expelling him from school without any pre-deprivation notice or opportunity to be heard. Plaintiff now seeks damages and other appropriate relief for these violations of his constitutional rights.

---

[1] Plaintiff was a minor at the time of this incident. Plaintiff reached the age of majority in November 2024.

1

## PARTIES

2. **Plaintiff Alan Dosky ("Alan")** is an adult resident of Davidson County, Tennessee.

3. **Defendant Jason Picanzo ("Lieutenant Picanzo")** is an adult resident of Cheatham County, Tennessee. Lieutenant Picanzo took all actions pertinent to this case in his capacity as a sworn law enforcement officer employed by the Metropolitan Nashville Police Department ("MNPD").

4. **Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro")** is a governmental entity organized under the laws of the State of Tennessee and located in Davidson County, Tennessee.

5. **Dr. Kelby Gardner ("Principal Gardner")** is an adult resident of Davidson County, Tennessee. Principal Gardner took all actions pertinent to this case in her capacity as the Executive Principal of John Overton High School, a Metropolitan Nashville Public Schools ("MNPS") high school.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this district and the events at issue in this lawsuit occurred in this district.

## FACTUAL BACKGROUND

### A. Background

7. Plaintiff Alan Dosky ("Alan") is eighteen years old. At the time of the incidents at issue in this lawsuit, he was a sixteen-year-old high school student enrolled at Metro Nashville Public Schools ("MNPS").

8. Alan is a U.S. citizen of Kurdish descent, whose parents immigrated to the United States from Iraq.

9. Alan has no criminal or juvenile delinquent history, other than the false arrest at issue in this lawsuit.

10. Alan's family members are educated professionals. However, due to Alan's mother's English language limitations, she conveyed power of attorney to Alan's aunt ("Ms. Dosky") while Alan was a minor for purposes of dealing with educational, medical, and other such institutions.

11. Notwithstanding the false arrest and erroneous expulsion that gave rise to this lawsuit, Alan is on track to graduate high school and has plans to attend college.

### B. The September 25, 2023 school shooter threat

12. On September 25, 2023, John Overton High was placed on lockdown due to a student's call that there was a potential shooter on campus.

13. Alan did not place that initial call.

14. Alan, as well as numerous faculty members and other students, believed that there was in fact a shooter at the school and that the shooter was going to kill people.

15. The faculty, students, and staff – including Alan – panicked.

16. The high school gym teacher, Christina Carlson, shepherded numerous students, including Alan, into a nearby classroom.

17. Ms. Carlson and the students continued panicking in the classroom. The noise and erratic behavior of the staff and students made things feel even more chaotic and unsafe.

18. Terrified for their lives, Alan and his friend called 911 and pleaded for help.

### C. MNPD responds to the school shooter threat

19. MNPD dispatched numerous officers to Alan's school.

20. Lieutenant Picanzo was one of the supervising officers who responded to the school.

21. The MNPD officers determined that there was in fact no actual shooter, and that the initial call-in threat had been a hoax.

22. Lieutenant Picanzo became aware that Alan and his friend had called 911 after the original hoax threat had been called in.

23. Without ever listening to the content of his 911 call, Lt. Picanzo decided that Alan's call to 911 was also a hoax.

24. Lt. Picanzo made this snap judgment without any specific information about the content of the call that would corroborate this erroneous belief.

25. If Lt. Picanzo had listened to the content of the recorded 911 call, it would have been immediately obvious to him that Alan's call was a *bona fide* call for help.

26. Based on his unfounded and erroneous belief that Alan and his friend had called in a hoax threat, Lt. Picanzo ordered his subordinate MNPD officers to arrest Alan.

### D. Alan is falsely arrested in front of his classmates

27. Acting on Lt. Picanzo's order, several MNPD officers called Alan to come out of the classroom.

28. In full view of the assembled students, the officers arrested Alan in the hallway.

29. The arresting officers did not explain to Alan what was going to happen to him, or read him his *Miranda* rights.

30. The officers aggressively searched Alan, and walked him through the school and into the parking lot in handcuffs.

31. Multiple students made cell phone videos of Alan being taken in handcuffs to the MNPD patrol car.

32. The jeering of students regarding Alan's arrest can be heard in the cell phone videos, which the creators ultimately posted on social media.

33. Alan was severely humiliated, with the students watching assuming that he must have committed some kind of horrible crime.

### E. Alan is exonerated and released without charges

34. After securing Alan in the MNPD patrol car, the arresting officers drove him to the juvenile detention facility at the Davidson County Juvenile Justice Center ("JJC").

35. The officers brought Alan into the JJC, and then delivered him into the custody of detention staff.

36. In the meantime, another MNPD supervising officer listened to the actual content of Alan's recorded 911 call.

37. Immediately upon listening to the 911 call, it was obvious to the supervisor that Alan had not called in a hoax – he had called to report his genuine fear at the shooter threat.

38. The MNPD supervisor contacted the District Attorney's Office that handles juvenile delinquency prosecutions in Davidson County, and spoke with the supervising Assistant District Attorney, Ms. Stacy Miller.

39. The supervising officer explained that Alan was innocent, and that he had been erroneously arrested.

40. Based on this information, Ms. Miller contacted the juvenile detention staff and directed them to release Alan from custody without the filing of a delinquency petition.

41. While he was in custody, Alan was not told why he had been arrested. He felt like he had no idea what was going on or why he was being held, and was petrified about what would happen to him.

42. While Alan was in custody no one from MNPD or MNPS called Alan's family to notify them about the arrest.

43. Alan's aunt learned through social media about the shooter threat at school, and called the school several times trying to get information. Finally, someone from the school told her that Alan had been taken to the JJC.

44. Alan's aunt then called the JJC several times, but was not given any information. Finally, she had her brother go down to the JJC

45. After Alan's uncle arrived at the JJC, the detention staff released Alan to him.

46. Before being released, Alan had spent between two and three hours in the custody of the detention center.

### F. MNPS expels Alan for the false arrest without giving Alan or his family the opportunity to be heard

47. After the arrest, no one from MNPS contacted Alan's family to discuss any potential disciplinary action the school might take as a result of the situation.

48. The next morning, September 26, 2023, Alan went to school and to class as usual.

49. However, when Alan arrived in class his teacher told him that his name was no longer on the attendance roster.

50. Alan's teacher did not explain why he had been taken on the roster, and told Alan that he would need to speak with the Hall Administrator.

51. Alan spoke with the Hall Administrator, who did not explain why either. The Hall Administrator then told Alan to speak with Principal Gardner.

52. Alan went to the Principal's Office, and spoke with Principal Gardner.

53. Gardner told Alan that he had been expelled because of the 911 call, and to collect his things and leave the school.

54. Under Tennessee law, unless there is an emergency a principal cannot impose a school suspension or expulsion unless and until the student has been "advised of the nature of the student's misconduct, questioned about it and allowed to give an explanation."

55. Under MNPS policy, "Expulsion is a measure of last resort." Furthermore, MNPS policy requires that all of the following factors be considered prior to expulsion:

    a. the student's age, health, disability, decision-making ability and prior intervention history;

    b. the student's willingness to repair the harm;

    c. the seriousness of the act;

    d. the harm caused or the potential to cause harm, including any injuries caused;

    e. the extent of actual disruption to the learning environment;

    f. whether the act was intentional.

56. MNPS policy also requires, "All interventions utilized prior to expulsion must be clearly documented in the Student Management System (Infinite Campus). All reasons for expelling a student rather than using a lower level of response must be clearly detailed."

57. Under both Tennessee law and MNPS policy, false bomb threats or other conduct disruptive to the school environment are not "zero tolerance" expulsion-level offenses. Rather, even a student guilty of such misconduct would be eligible for suspension in lieu of expulsion, unless other factors justified the imposition of such a severe "last resort."

58. There was no "emergency" that would have made it impracticable for Principal Gardner to notify Alan and his family that expulsion was being considered, or to give Alan the opportunity to be heard regarding this potential draconian disciplinary response.

59. If Principal Gardner had given Alan the opportunity to be heard, Alan would have explained that MNPD had made a mistake, that MNPD had realized the mistake once they actually reviewed his 911 call, and that the JJC had released him without charges once the mistake was discovered.

60. On information and belief, prior to making the expulsion decision Principal Gardner did not give *bona fide* consideration to MNPS's pre-expulsion decision-making prerequisites, did not document any prior interventions with Alan, and did not document the reasons for imposing expulsion rather than a lower level of response.

61. Alan contacted his family, and they came to pick him up from school.

62. When Alan's family came to get him, neither Principal Gardner nor any other MNPS staff explained to Alan or his family why Alan was being expelled, nor did they explain that there was an MNPS process for challenging this expulsion on the back end.

63. Alan's aunt, who at the time had power of attorney for Alan to assist in handling his educational affairs, went to the school that same day to attempt to talk to Gardner.

64. Gardner refused to meet with Alan's aunt that day, and the MNPS staff refused to give her any additional information regarding the expulsion.

65. Alan's aunt was informed that she would have to schedule a meeting for another day, so she scheduled a meeting with Gardner for September 29, 2023.

66. During these intervening days, MNPS did not permit Alan to attend or enter the school.

67. On September 29, 2023, Alan's father and aunt met with Principal Gardner.

68. During this meeting, Gardner claimed that she had personally listened to the 911 call and that it was obvious from the call that Alan was joking. Gardner specifically claimed that Alan was laughing and joking during the call, which he was not.

69. During the meeting Gardner hand delivered a Notice of Expulsion letter to Alan's aunt and father. The Notice was authored by John Overton Academy Principal Seteria Watkins, and was dated for September 27, 2023.

70. The Notice erroneously alleged that Alan had called in a second hoax threat to 911 after MNPD had already cleared the first hoax threat, even though MNPD and the District Attorney's Office had exonerated Alan of this accusation back on September 25, 2023.

71. The Notice also claimed:

   *This event disrupted the learning environment since the school had to remain on lockdown and police had to search the classroom to find Alan. Based off witnesses it is believed that Alan called the police as a joke. Upon investigating it was concluded that this called was made as a joke and not based off fear of his life.*

72. The letter advised that Alan's family could appeal the decision by requesting a hearing within five days of receiving the Notice.

73. Alan's aunt and father explained to Gardner that Alan was innocent, and that he had been exonerated by MNPD. However, Gardner insisted that the expulsion would stand.

74. However, later on that same day Gardner and an assistant principal called Alan's aunt on the telephone. The principals told Alan's aunt that the expulsion had been lifted, and that Alan could return to school the next day.

75. In the meantime, word had spread through the John Overton student body about Alan's arrest and expulsion, and many students had viewed the cell phone videos posted online.

76. Alan nonetheless returned to school at John Overton High the next day, laden with the shame and humiliation of the false arrest, expulsion, and negative social media exposure.

9

# CLAIMS FOR RELIEF

### COUNT I: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION (42 U.S.C § 1983)

#### (DEFENDANT PICANZO)

77. Plaintiff hereby reincorporates paragraphs 1 – 76 by reference.

78. On September 25, 2023, MNPD officers arrested Alan.

79. Defendant Lieutenant Picanzo gave the order to detain Alan.

80. Because of Picanzo's arrest order unnamed other MNPD officers[2] illegally arrested Alan, took him into custody, and then delivered him into the custody of the Juvenile Justice Center where he would remain for two to three hours.

81. Defendant Picanzo lacked probable cause to issue the arrest order.

82. Defendant Picanzo acted under the color of state law in issuing the arrest order.

83. Defendant Picanzo acted in blatant disregard for Alan's constitutional rights, jumping to the conclusion that Alan's call was a hoax without ever listening to the content of it.

84. Defendant's illegal arrest caused Alan to suffer a deprivation of liberty, physical discomfort, humiliation, and severe emotional harm, and was a catalyst for the MNPS expulsion that followed.

---

[2] Plaintiff anticipates amending to add the actual arresting officers as defendants once their identities are ascertained through the discovery process. Plaintiff's family and Counsel made several efforts to obtain this information from MNPD prior to filing this lawsuit, however MNPD refused to provide this information.

# COUNT II: EXPULSION WITHOUT DUE PROCESS IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
## (42 U.S.C. § 1983)
### (DEFENDANTS METRO AND PRINCIPAL GARDNER)

85. Plaintiff hereby reincorporates paragraphs 1 – 76 by reference.

86. On September 26, 2023, Defendants Metro and Principal Gardner expelled Alan from MNPS based on false allegations.

87. The false allegations that formed the basis for the expulsion had already been disproven the day before by MNPD and the District Attorney's Office.

88. If Gardner and MNPS had given Alan and his family even the most basic right to be heard, they would have made Defendants aware of Alan's exoneration.

89. However, Gardner and MNPS gave Alan and his family no opportunity at all to be heard, instead rushing to expel him based on the outdated and false allegations.

90. Although MNPS reversed the expulsion decision on September 29, 2023, this did not remedy the harm of having expelled Alan without due process for four days.

91. Alan's expulsion violated his Fourteenth Amendment right to procedural due process, because it was a severe disciplinary consequence for which no pre-deprivation process at all was provided.

92. Although MNPS has a post-deprivation process, MNPS's post-deprivation process was inadequate to remedy the harm suffered by Alan because:

    a. MNPS mooted Alan's family's potential disciplinary appeal by informally reversing the expulsion decision before they had any meaningful opportunity to submit a request for an appeal; and,

    b. Even a successful appeal would not have remedied the harms of lost education time, reputational damage, emotional trauma, and loss of trust in the system.

93. Alan's expulsion violated his constitutional rights and inflicted reputational damage, educational harm, and emotional harm upon him.

## REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.
2. That this cause be tried by a jury.
3. That judgment for Plaintiff enter against the Defendants on each count.
4. That Plaintiff be awarded nominal, compensatory, and punitive damages against Defendants.
5. That Plaintiffs be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).
6. That the court costs in this matter be taxed to Defendants.
7. That Plaintiffs be awarded all other relief to which it may appear they are entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Brian Daniel Mounce, BPR 39545
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Brentwood, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: Kyle@relentlesslaw.com